**UNITED STATES of America**

v.

**Franklin BOYKOFF, Defendant.**

**No. 01 CR. 493(CM).**

United States District Court,
S.D. New York.

Jan. 23, 2002.

Jared J. Scharf, White Plains, NY, for defendant.

## DECISION AND ORDER GRANTING MOTION TO EXCLUDE EXPERT TESTIMONY AND DENYING MOTION TO SUPPRESS CERTAIN STATEMENTS [1]

MCMAHON, District Judge.

In this prosecution of a certified public accountant for conspiracy to defraud the Internal Revenue Service and obstruct governmental administration, in connection with his own taxes and those of his clients, the Government moves to exclude the testimony of a psychiatric expert proffered by the defense and Defendant moves to suppress statements made by him and by one of his clients at an interview with a Revenue Agent. For the reasons set forth below, the Government's motion is granted and the Defendant's motion is denied.

### Motion to Exclude Expert Testimony

In anticipation of trial, the defense had Boykoff examined by Dr. Howard Zonana, a Yale University medical professor, and proffered an expert report to the Government in anticipation of calling Dr. Zonana as a witness. From the report, it ap-

1. This written opinion memorializes oral rulings made on January 18 and 23, 2002.

peared that Dr. Zonana would testify that Boykoff suffers from a bipolar personality disorder and an attention deficit disorder.[2] Dr. Zonana opined that Boykoff's attention deficit disorder caused him to have difficulty staying focused, and that his bipolar disorder, while not reaching overtly psychotic proportions, had substantial effects on his judgment. (Zonana Report at 11, 14). The defense proffered this testimony as relevant to the issue of Boykoff's criminal intent, even though Dr. Zonana concluded that a determination of whether Boykoff's conditions "reach[es] a level that affects his 'willfulness' would require a detailed review of the pattern and characteristics of over or underestimations in the tax returns under review." (Zonana Report at 14).

■ The Government's challenge to the admissibility of Dr. Zonana's testimony is well taken, for three separate reasons.

First, Dr. Zonana's testimony would not assist the trier of fact to understand the evidence or to determine a fact in issue— in this case, Boykoff's ability to form the intent necessary to commit the crimes of which he stands accused. Fed.R.Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Of course, Dr. Zonana may not opine that Boykoff did not have the requisite *mens rea* to commit the crimes with which he is charged. Federal Rule of Evidence 704(b) provides that, "No expert testifying with respect to the mental condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." However, assuming *arguendo* that evidence of mental disease can be used to negate an inference of specific intent for specific intent crimes—an issue not yet decided by the Second Circuit, *see United States v. La Plante*, 108 F.3d 330 (2d Cir.1997)—Rule 702's helpfulness standard "requires valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert, supra.*, 509 U.S. at 591–92, 113 S.Ct. 2786. Thus, courts that have admitted evidence of mental disease or defect the issue of whether a defendant had the ability to form the requisite *mens rea* have required the defendant to explain a link between the evidence sought to be introduced and the *mens rea* in dispute. They have refused to admit mental disease evidence where no direct link could be established between it and the issue of *mens rea*. *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990); *United States v. Richards*, 9 F.Supp.2d 455, 459 (D.N.J.1998).

Dr. Zonana has not proffered any link between the specific evidence he would give and the *mens rea* in dispute in this case. Indeed, Dr. Zonana specifically disclaims any ability to connect Boykoff's disorders to willfulness, stating that this would require a detailed examination of the various returns he prepared. Therefore, the good doctor's testimony would hardly be helpful to the jury. Moreover, Dr. Zonana would be hard-pressed to make the requisite link, since his report exhibits no awareness of the true nature of the charges against Boykoff, which include allegations, not simply of errors, but of deliberate misconduct, including fabrication of documents and subornation of perjury by Boykoff.

Because he cannot link Boykoff's alleged psychiatric disorders to defendant's willfulness, Dr. Zonana's testimony is inadmissi-

---

**2.** Boykoff had not sought treatment for these conditions prior to being examined by Dr. Zonana.

ble for a second reason: it would only serve to confuse the jury.

Fed.R.Evid. 403, because its probative value is substantially outweighed by its capacity to mislead the trier of fact. As the First Circuit recently stated, the use of mental disease evidence in an effort to negate an element of an offense, "tend[s] to reintroduce the very concepts that Congress wanted to exclude [when it limited the parameters of the insanity defense] and thereby to mislead the jury." *United States v. Schneider,* 111 F.3d 197, 203 (1st Cir.1997). Indeed, the use of such evidence "presents an inherent danger that it will distract the jury from focusing on the actual presence or absence of *mens rea.*" *Cameron, supra.,* 907 F.2d at 1067. Thus, such testimony is inherently confusing. To be admissible, it should have a strong tendency to prove an inability on the defendant's part to form the requisite state of mind.

As Dr. Zonana expressly disclaims any ability to prove anything related to Boykoff's state of mind, his testimony has no probative value whatever on the issue of *mens rea.* It could only serve to confuse, by suggesting (erroneously) that the defendant was entitled to prove a diminished capacity defense.

Finally, Dr. Zonana's testimony is inadmissible because, by incorporating assertions made by Boykoff to Dr. Zonana, it embraces an ultimate issue of fact. In order to understand the basis for Dr. Zonana's opinions, the jury would need to know what Boykoff told him, because those opinions are based almost entirely on Boykoff's assertions of fact. This simply puts defendant's denial of willfulness in the mouth of someone other than himself, which is impermissible. *United States v.*

*Rahman,* 189 F.3d 88, 136 (2d Cir.), *cert. denied* 528 U.S. 982, 120 S.Ct. 439, 145 L.Ed.2d 344 (1999).[3]

Dr. Zonana's testimony is disallowed.

**The Motion to Suppress**

On the first day of trial, defendant moved *in limine* to suppress a portion of the testimony of IRS Revenue Agent Nancy Monachino, who conducted the audit that forms the basis for Count 23 of the Indictment. In that count, Boykoff is charged with obstruction of governmental administration. Defendant also sought to suppress the corresponding portion of the testimony of Dr. Paul Weiser, the taxpayer who allegedly conspired to obstruct the audit. In substance, Boykoff argued that incriminating statements made to Agent Monachino by Dr. Weiser at an interview on July 13, 1995—statements that would be introduced against Boykoff under the co-conspirator exception to the hearsay rule—as well as statements made by Boykoff, should be suppressed because they were obtained by ruse and/or in violation of IRS internal regulations. These regulations required that, once Agent Monachino had a firm indication of fraud, the matter should have been in the hands of the IRS Criminal Investigation Division (CID). *See* IRS Internal Review Manual (IRM) 4565.21, 9311.83(1).

■■■■ Defendant realized from the outset that he had an uphill climb on this motion. It has been the law for over two decades that violation of agency rules in the conduct of an investigation does not warrant suppression of evidence obtained during that investigation. *United States v. Caceres,* 440 U.S. 741, 755, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Moreover, as Chief Judge Posner of the Seventh Circuit noted

---

**3.** At the final pre-trial conference defendant, in a vain attempt to get me to change my mind, stipulated that Dr. Zonana would not testify unless Boykoff testified first. However, this concession is irrelevant to the decision on the motion, because there are two other independent grounds for denying it.

in the most recent of the post-*Caseres* cases involving the very IRS regulation at issue, *United States v. Kontny*, 238 F.3d 815 (7th Cir.2001), the exclusionary rule bars admission of statements obtained in the course of a non-custodial interrogation only if those statements were involuntary—that is, were obtained by threat or promises. Weiser and Boykoff were concededly not in custody during the interview in question, and defendant bears the burden of proving that they gave statements to the Agent involuntarily.

At a hearing convened before opening statements, the Government produced Agent Monachino, who testified credibly as follows: she was auditing Dr. Weiser's returns beginning in 1993. She had conducted an extensive investigation into certain expense deductions, and as part of that investigation had made inquiry of third parties, such as restaurants and hotels. This led her to evidence of fraud. Agent Monachino sought to interview Dr. Weiser about these matters, but Weiser, through his representative, Boykoff, declined at least two requests for an interview during her investigation.

By February 1995, Agent Monachino wished to assess a civil fraud penalty against Dr. Weiser. It was an IRS rule at the time (though it is no longer) that any matter involving assessment of a civil fraud penalty had to be referred first to CID, so the criminal investigators would have an opportunity to evaluate the case and take the matter over before assessment of the civil penalty. In accordance with this rule, she referred Dr. Weiser's returns to CID; CID declined the reference and the matter was returned to her.

The return routing slip contained instructions that, if she wished to assess a civil penalty, she would need clear and convincing evidence of fraud and that she should consult IRM 4563.42 to obtain the criteria for asserting civil penalties. (Suppression Hearing, GX 1). The introduction to that section of the IRM includes a reminder that a fraud charge can only be brought when the taxpayer himself makes a knowingly false representation with intent that it be relied upon. IRM 4563.41. Agent Monachino understood that CID had sent the matter back because she had not interviewed the taxpayer and therefore had not established who had altered the receipts that suggested the commission of fraud. (Government Ex. A filed in opposition to the Motion). Accordingly, Agent Monachino contacted Boykoff and again asked that he produce his client for an interview. Agent Monachino could have issued a summons compelling Dr. Weiser to appear, although she understood that she could not compel him to speak. However, Boykoff agreed to produce Weiser, and both men appeared voluntarily at an interview with Agent Monachino in July 1995.

During that interview, Dr. Weiser gave numerous incriminating statements, including identifying his handwriting on a fraudulent entertainment expense diary and on various receipts that Agent Monachino had ascertained to have been altered. He also told a number of lies to Agent Monachino. These lies were exposed during the course of the interview, and it terminated abruptly.

Before Dr. Weiser and Boykoff left, Agent Monachino asked Dr. Weiser to sign an affidavit explaining all the problems she had raised during the interview. No such affidavit was ever filed. Accordingly, Agent Monachino again referred the matter to CID so that she could assess a civil fraud penalty. This time, CID took the case away from her. Dr. Weiser was charged with criminal tax fraud; he subsequently pled guilty and will testify against Boykoff pursuant to a plea agreement.

Agent Monachino testified that the only person present with her during the fateful

interview was her supervisor, who is on the civil side of the IRS as well. No person from CID was present at that interview. Agent Monachino did not meet with or speak to anyone from CID prior to conducting the interview; she did not receive instructions from CID on what to ask, or deal with CID at all in connection with Dr. Weiser except to seek, twice, permission to impose a civil fraud penalty. At no time was Agent Monachino asked to make Boykoff the subject of any investigation. At no time during the interview did Agent Monachino ever threaten Weiser and Boykoff in order to induce them to speak to her, or promise them anything—for example, that Dr. Weiser would not be prosecuted—in exchange for their cooperation.

At the conclusion of the hearing, defense counsel admitted that he had been unable to elicit evidence of threats or promises by Agent Monachino. Nonetheless, he persisted in his application, grounding it in a creative theory that is difficult to describe but that goes something like this: because Agent Monachino had concrete evidence of fraud, CID should have assumed jurisdiction over the case when she initially referred the matter to it for review; by sending the case back with a virtual instruction that she interview the taxpayer, CID was in effect asking a civil agent to do its work (whether she realized it or not); and because it appeared that the matter was being handled civilly, when it was in reality a criminal case, Dr. Weiser and defendant were deluded into attending the meeting and making the incriminating statements. This rendered their statements involuntary, because if they had known that Agent Monachino was the unwitting tool of CID, they would never have met with her.

With all respect to defense counsel, this is ridiculous. I cannot possibly state the applicable principles any better than Chief Judge Posner did in *Kontny:*

> Virtually all cases involving coerced confessions involve the questioning of a suspect who is in police custody, an inherently intimidating situation in which people find it difficult to stand up for their rights or even to think straight. The situation is different when a person who does not even know that he is a criminal suspect (that is the premise of the Kontnys' appeal) is being interviewed in his home, and by a civil rather than a criminal investigator to boot. [The agent] was unarmed, un-uniformed, unaccompanied. The Kontnys were at no disadvantage in dealing with him. They were under no pressure to answer his questions. Any answers they gave were voluntary.
>
> Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises. (Citations omitted)......
> *Nothing* is more common in the noncustodial setting of police investigations than for an undercover police officer to extract a damaging admission from a criminal suspect simply by pretending to be another criminal. The admission is useable in evidence against the suspect even though he would never have spilled the beans to the officer had he known the officer's status....
>
> So even if [the agent] was pretending to be conducting a civil investigation but was really, as the appeal argues, conducting a criminal one, this would not, under the rules that govern the admissibility of incriminating statements (written or oral) made to government officers *even by a suspect who is in custody,* make the statements inadmissible. The circumstances did not remotely prevent the Kontnys from making a rational de-

cision about whether to play ball with [the agent].

*Kontny,* supra., 238 F.3d at 817–18.

It is hard to imagine a ruling more apposite to Boykoff's situation than this one. Agent Monachino interviewed Dr. Weiser at her office, not at his home, and her supervisor (also a civil investigator) was present at the interview; but the two cases are otherwise indistinguishable—with two important caveats, both of which make the Government's position here even stronger. First in Kontny, the taxpayers were charged with fraud in connection with tax returns previously filed; here Boykoff is charged with obstruction, based on, among other things, the fact that false statements were made to Agent Monachino at the July 1995 interview. Assuming arguendo that Agent Monachino was being used by CID to conduct a de facto criminal investigation, she was not investigating the crime of obstruction. Second, Dr. Weiser, unlike the Kontnys, was accompanied to his interview by an accountant, who also happened to be an attorney—Boykoff. While ignorance of the law would be no excuse, it is unfathomable that defendant, with his years of experience representing clients in audits, was not aware that it is a crime to lie to a federal agent—even one conducting a civil inquiry. 18 U.S.C. § 1001. Indeed, every tax return Boykoff ever prepared contained a legend to the effect that a false statement on that return was punishable as perjury. Thus, by virtue of his training and experience, Boykoff was extremely well positioned to make, and help Dr. Weiser make, a rational decision about whether to "play ball" with Agent Monachino, no matter what kind of investigation she was conducting at the time of the interview.

To the extent Boykoff suggests that he and Weiser were somehow entrapped into making the incriminating statements sought to be suppressed because they did not know that CID was already aware of Weiser's situation, his argument is no more persuasive than that of every common criminal who brags about his exploits to an undercover cop. Their will was not overborne; they were not threatened or beaten; there was no coercion. As Agent Monachino pointed out, she did not even have to issue a summons to compel Dr. Weiser's appearance; Boykoff produced his client voluntarily. And the client lied voluntarily.[4] Assuming the Government adduces the quantum of evidence necessary to admit those statements against Boykoff as co-conspirator hearsay, they will be heard by the jury, whose province it is to make the ultimate determination whether Boykoff conspired with his client to obstruct Dr. Weiser's audit.

---

4. Boykoff has heretofore taken the position that Dr. Weiser's statements were lies of which he (Boykoff) was unaware until they were exposed as such during the July 1995 interview. Thus, there does not seem to be any dispute about the veracity of Dr. Weiser's incriminating statements made during the course of that interview.