In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2720

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KEVIN T. O'DOHERTY,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 cr 606—**Harry D. Leinenweber**, *Judge*.

ARGUED FEBRUARY 17, 2011—DECIDED JUNE 14, 2011

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
TINDER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Kevin Thomas O'Doherty was
charged in a six-count indictment with various offenses
related to his failure to file income tax returns or to pay
taxes from 2001-2003. After entering into an agreement
with the Government, Mr. O'Doherty pleaded guilty to
one count of tax evasion, in violation of 26 U.S.C. § 7201.
At sentencing, the district court calculated an offense

level of 21, carrying a range of 37-46 months' imprisonment under the sentencing guidelines. The district court imposed a 24 months' sentence, more than a year below the advisory guidelines range. Mr. O'Doherty now raises several challenges to the guidelines calculation. We agree with the district court's sentencing calculations and therefore affirm the judgment of the district court.

# I

# BACKGROUND

## A.  Facts

Mr. O'Doherty was a commodities trader for thirty-nine years. At some point during this period, he paid for the services of a fraudulent tax consultant, and, under that individual's guidance, he did not file individual income tax returns for the better part of a decade.

In the mid-to-late 1990s, Mr. O'Doherty used the firm Refco as his clearing broker. Apparently, during this period, Mr. O'Doherty traded in his own name, and Refco reported his gross income from trades on 1099 forms filed with the Internal Revenue Service ("IRS").

During 2001, Mr. O'Doherty "changed tactics" from trading in his own name to "creat[ing] shell corporations" to conduct his trading activities. R.34 at 8. Specifically, he set up four accounts at two different financial institutions, each in the name of a separate entity. Those accounts received his trading profits, partnership distributions, consulting fees and payments from traders for

seat leases during the charged period. He used the funds in the accounts to pay his personal expenses. He also used the entities to conceal what was essentially his personal ownership of assets. Through these entities, Mr. O'Doherty received gross income of $158,480, $617,809 and $337,848 in tax years 2001-2003, respectively.

In 2007, the Government instituted a civil action against Mr. O'Doherty; it alleged that Mr. O'Doherty had failed to file tax returns in 1994, 1995, 1997, 1998 and 2000, and that his total tax liability for those years was $917,801. That tax liability was calculated on the basis of Mr. O'Doherty's 1099s prepared by Refco. The civil proceeding was not resolved at the time of Mr. O'Doherty's criminal prosecution, but instead was stayed, apparently at Mr. O'Doherty's request.

## B. District Court Proceedings

In this criminal action, commenced in 2009, the Government charged Mr. O'Doherty with three counts of tax evasion, in violation of 26 U.S.C. § 7201, and three counts of failing to file federal income tax returns, in violation of 26 U.S.C. § 7203. The charged conduct related only to tax years 2001, 2002 and 2003.

### 1. The Plea Agreement

Mr. O'Doherty entered into an agreement with the Government in which he pleaded guilty to one count of tax evasion for tax year 2001. The agreement included

specific information relating to the tax losses from the charged conduct:

> The parties agree that the base offense level for tax evasion is determined by the amount of the tax loss. The defendant acknowledges that the government can prove, by at least a preponderance of the evidence, that the total tax loss resulting from defendant's conduct during the time period discussed in paragraph 6 above, is $425,766. The parties acknowledge that this tax loss figure, that is more than $400,000 and less than $1 million, results in a base offense level of 20.

R.18 at 6 (citing U.S.S.G. §§ 2T1.1(a)(1), 2T4.1(H), 1B1.3). Paragraph 6 set forth the factual basis for the charges related to Mr. O'Doherty's failure to file returns from 2001 through 2003. That paragraph also includes specific language memorializing that the defendant admitted the facts underlying the charges and that these facts "constitute relevant conduct pursuant to Guideline § 1B1.3." *Id.* at 2.

The agreement also included a lengthy section relating to the parties' positions on the appropriate guidelines calculation:

> d. **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the government's position is that defendant's anticipated offense level is 19, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines

range of 30-37 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant's position is that the anticipated offense level is 17, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 24-30 months.

e.  Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.  Both parties expressly acknowledge that this plea agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guide-

lines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

*Id.* at 8-9. The agreement also set forth the parties' opposing positions on the proper application of the sophisticated means enhancement found in U.S.S.G. § 2T1.1(b)(2). Finally, the agreement noted that "[e]ach party is free to recommend whatever sentence it deems appropriate" to the court. *Id.* at 9.

### 2. The Plea Hearing

At the plea hearing, the Government advised the court that both parties understood that there might be further adjustment in the total tax loss and pointed out that the plea agreement specifically allowed for a change in that figure. The court advised Mr. O'Doherty that there could be no guarantee as to the sentence that he would receive and specifically noted that the court was not bound by the guidelines calculations but only by the statutory maximum of five years. Mr. O'Doherty told the district court that he understood that no promises had been made to him and that the only understanding that he had with the Government was the one set forth in the plea agreement.

### 3. The Positions of the Parties at Sentencing

During the preparation of the presentence investigation report ("PSR"), the Government submitted a memorandum to the probation office. That memorandum included the same calculation that the Government had used in the plea agreement, including an estimation that the appropriate base offense level was 20 (tax loss of more than $400,000 and less than $1 million dollars). It further took the position that the facts of the case supported an upward adjustment of two levels for the use of a sophisticated means to mask the unpaid taxes and a three-level downward adjustment for the acceptance of responsibility. The resulting total offense level was 19. With a criminal history category of I, the resulting advisory guidelines sentencing range was 30-37 months. The Government recommended a sentence within that range.

When it filed its presentence report, the Probation Office took a different view. It reached a much larger tax loss figure by adding tax losses from uncharged conduct occurring from 1994-2000 together to the charged conduct from 2001-2003. In estimating the loss attributable to the uncharged conduct during the earlier period, the PSR used the figure sought in the civil action covering those earlier years, $917,801. When this figure was combined with the tax losses admitted in the plea agreement, the resulting total tax loss calculation was more than $1 million but less than $2.5 million. This calculation resulted in a base offense level of 22, two levels higher than if the losses had remained at the level

suggested by the Government and noted in the plea agreement.

Mr. O'Doherty responded to the PSR by filing a motion to continue the sentencing hearing. He noted that, after the plea agreement had been reached, he filed amended returns for tax years 2001-2003 that showed a tax liability of less than $400,000 during that charged period. He pointed out that the PSR failed to account for this reduced liability. He also contended that the PSR erred in including as relevant conduct the tax losses alleged in the civil suit relating to the earlier years from 1994-2000. In his view, inclusion of those years as relevant conduct was not contemplated by the plea agreement, and, in any event, the tax losses alleged in the civil complaint were too speculative to form the basis for sentencing in the criminal case. His sentencing memorandum reiterated these arguments and also discussed mitigating factors at some length. As a result, he argued for a lower guidelines calculation and a downward adjustment.

The Government also filed with the court a sentencing memorandum. On the subject of tax loss, the Government simply noted that, given the agreed-upon figures for 2001-2003, "the PSR's conclusion that the total tax loss for the prosecution period and for all relevant conduct is more than $1 million and less than $2.5 million meets the Guidelines' requirement of a reasonable estimate based on the available evidence." R.25 at 6.

### 4. Sentencing Hearing

At the sentencing hearing, the district court began with the issue of tax loss. The Government reiterated its position that it "did not object to [the] calculation" in the PSR. R.34 at 4. It also noted that *state* tax losses should be included in the calculation. With those numbers, the losses for the 2001-2003 period alone were in excess of $400,000; combined with the additional earlier years identified in the civil complaint and subsequent years through 2009, total losses were estimated reasonably at over $1 million.[1] R.34 at 4, 11. The Government therefore agreed that, as a result of the additional tax loss amounts, the PSR was correct in its estimation that the appropriate base offense level was 22.

Mr. O'Doherty then argued for a base offense level of 18, two *lower* than that contemplated in the plea agreement and four lower than that recommended in the PSR. He restated his view that further corrected tax returns for 2001-2003 had lessened the tax liability for that period to *under* $400,000. Because he believed the Government

---

[1] The relevant Guideline for tax evasion, U.S.S.G. § 2T1.1, refers to a tax loss table in section 2T4.1. Beginning with loss amounts under $2,000, the table sets forth, at various increments, associated base offense levels, ranging from 6 to 36. Tax losses of more than $200,000 and up to $400,000 result in a base offense level of 18; losses of more than $400,000 and up to $1,000,000 result in a base offense level of 20; losses of between $1,000,000 and $2,500,000 result in a base offense level of 22. *See* U.S.S.G. § 2T4.1.

was bound contractually to limit its recommendation regarding relevant conduct to those years referenced explicitly in the plea agreement, he contended that a loss of less than $400,000 represented the total loss that could be used to arrive at his base offense level.[2]

---

[2] Regarding the calculations, Mr. O'Doherty's counsel stated the following:

> The plea agreement was based on a tax loss figure of between $400,000 and $1 million. We all knew at the time of the plea agreement that there were other years outstanding, those other years are subject to litigation that is currently pending and attempts to actually reduce that number to a real number.

> That number is very, very speculative, as was noted in our sentencing memorandum. Mr. O'Doherty was a commodities trader. In any given year he was involved in tens of thousands of contracts. Ultimately at the end of the year, he gets a 1099 from the clearing broker for the gross figures, but that doesn't include costs, it doesn't include commissions, it doesn't include other sides of the trade.

> . . . .

> Every time we get more records, the return information is coming down. We believe that the plea agreement at the time that it was entered into only considered 2001 to 2003, and that number is now $367,000.

> Since that time, and in the government's sentencing memorandum—well, one, we will accept the probation officer's figures that it is at least $1 million because

(continued...)

---

[2] (...continued)

> of these other tax years, even though they have not been reduced to final numbers.

> And 2, even if that is not the case, just using the State Tax figures, that pushes it back up to $409,000, or just over the break point.

> So, when you filter that in, all together we are 4 levels apart.

R.34 at 6-7. Later, he added:

> In large part, the civil case has been pending since 2007, we all know it is floating around out there, and we are all—it is not [the Government's attorney's] case, it is also my case, and we have been trying to come up with a real number in that case. Is the number a million? No. Is it—who knows what the number is. Some of those years are actually losses, but until we can get the records from the receiver, which has been a very frustrating process, it is hard to get that number.

> I would argue, Number 1, that the other years are very, very speculative. Number 2, notwithstanding [the probation officer's] ability to bring up that information to the Court, I still believe that the government is bound by the 4 corners of the plea agreement.

> No one would have any faith in the plea process, or in the plea agreement process, if we could suddenly bring up information that was known to the government in civil cases being prosecuted by the U.S. Attorney's Office. This isn't a secret. This isn't newly discovered information. This is something that we all knew

(continued...)

The district court ruled the failure to file returns during the entire 1994-2003 period was relevant conduct, although it would not consider conduct occurring after 2003. Further, the court elected to use the figures charged in the civil complaint as the estimate for tax liability for years 1994-2000, because "those are the final figures, at least the ones we have to work with, and they total $917,000." *Id.* at 14. Combined with the losses for the charged period of 2001-2003, the court noted that the total loss was "$1.2 million plus," and the base offense level was appropriately 22. *Id.*

The hearing's focus then turned to whether Mr. O'Doherty had employed sophisticated means. The Government submitted that the application note to the relevant Guideline specifically referenced the use of shell corporations as justifying application of the enhancement. The Government argued that the purpose of the various entity accounts was nothing "other than to channel Mr. O'Doherty's actual personal income through

---

[2] (...continued)
about, but nobody could put a number on it, and at the time of the plea agreement, frankly, I don't believe that we would have agreed to the plea agreement if we knew that the government was going to argue a million dollar tax figure.

We all knew that the Probation Officer had the ability to do that, and there is a big difference between the government arguing it and the Probation Officer bringing it to your Honor's attention.

*Id.* at 9-10.

a business entity to conceal the fact that it was income to him." *Id.* at 15. Mr. O'Doherty contended, however, that the accounts had legitimate business purposes and were not solely to hide income; one was in the name of a brokerage firm that comprised some 25 affiliated small traders. The court ruled:

> The short of the matter is, however, that he used corporations, whether they were specifically designed solely for evading taxes or not, but if you—it seems to me if you use a corporation to evade taxes, even if you didn't set it up necessarily for that specific purpose, but used it for that purpose, it sounds to me that that is more sophisticated than the typical guy who just doesn't file returns.

*Id.* at 16. The court applied the two-level enhancement under § 2T1.1(b)(2) and a three-level reduction for acceptance of responsibility to arrive at an offense level of 21. When combined with Mr. O'Doherty's criminal history category of I, the resultant sentencing range under the Guidelines was 37 to 46 months.

The court then heard argument on the § 3553(a) factors. Mr. O'Doherty argued for a below-guidelines sentence, focusing primarily on Mr. O'Doherty's family; his daughter was battling cancer at the time of sentencing, and Mr. O'Doherty was the primary caretaker to his granddaughter. He further noted that, outside of these tax offenses, he had led an honorable life and that, as a result of his conviction, he already had been stripped of his trader's license and was without a profession. He contended that a below-guidelines sentence was appro-

priate given his family circumstances, under Guideline 5H1.6.[3] The Government maintained its request for a within-guidelines sentence. It contended that Mr. O'Doherty's life circumstances were similar to those faced by many defendants, that his criminal conduct spanned many years, which demonstrated disregard for the law, and that his offense was a serious one.

After reviewing the circumstances, including the family health issues, the court stated:

> I am trying to figure out ways to mitigate your case, and one of the ways it appears to me is that this uncharged conduct, apparently there has

---

[3] Guideline 5H1.6 provides that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. However, the relevant application note adds that a judge may consider "[a] departure under this policy statement based on the loss of caretaking or financial support of the defendant's family" in certain circumstances. *Id.*, app. 1(B). Those circumstances are limited and specific under the relevant note, applying only where a sentence within the range will "cause a substantial, direct, and specific loss of essential caretaking" and where "[t]he loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant," as well as in other circumstances not relevant here. *Id.*; *see also United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008) ("Although [t]he concept of departures has been rendered obsolete in post-*Booker* sentencing . . . the district court may apply those departure guidelines by way of analogy in analyzing the section 3553(a) factors." (modifications in original) (internal quotation marks omitted)).

been some reduction, and by the time the records come forth, there are reductions in the amount due, and it would seem to me, based on what the government's figures here, that they are claiming that you didn't pay $31,000, $41,000, $51,000, all of a sudden, $700,000, and so I think it is some—I can, I think, reasonably conclude that the figure that the government has is higher than it probably will end up being.

And so I am prepared to, on a 3553 factor, the nature of the crime here, to say that it probably will end up not involving more than a million dollars, so that I can see my way clear to—I am not moving to—I am just saying I will consider that under 3553, and I will sentence, but based upon the fact that that probably overstates the seriousness of the crime, and therefore, have some reduction there.

R.34 at 30-31. After again noting his cooperation and his family medical issues, the court concluded that "a sentence within the guidelines, which is 37 to 46 months, is considerably higher than probably need be." *Id.* at 31. Accordingly, the court sentenced Mr. O'Doherty to 24 months' imprisonment, followed by a three-year term of supervised release.

## II

## DISCUSSION

Mr. O'Doherty submits that he is entitled to resentencing for three reasons. First, he claims that the Gov-

ernment materially breached the plea agreement when it assented to the PSR's tax loss calculations, which included additional years of relevant conduct. Second, he claims that the total amount of tax loss found by the district court at sentencing was not proven by sufficient evidence. Finally, he claims that the district court erred in applying the sophisticated means enhancement of Guideline 2T1.1(b)(2). We shall address each contention in turn.

## A. Interpretation of the Plea Agreement on Relevant Conduct

We first address the appropriate time period from which to calculate relevant conduct for sentencing. According to Mr. O'Doherty, the plea agreement bound the Government to limit its recommendation to losses accrued during the charged period only. In his view, although the Probation Office was free to recommend that conduct other than that covered by the plea agreement be included in the calculation, the Government was precluded, by virtue of its contractual undertaking in the plea agreement, not to assent to any such recommendation. Therefore, we must examine the nature of the promises made on the subject of relevant conduct in the agreement.

We review plea agreements using ordinary rules of contract interpretation, but we are mindful of "the special public-interest concerns that arise in the plea agreement context." *United States v. Monroe*, 580 F.3d 552, 556 (7th Cir. 2009). Accordingly,

> [w]e review the language of the plea agreement objectively and hold the government to the literal terms of the plea agreement. Therefore, when a plea agreement is unambiguous on its face, this court generally interprets the agreement according to its plain meaning. When the language of an agreement is ambiguous, however, the essence of the particular agreement and the Government's conduct relating to its obligations in that case are determinative.

*Id.* (modification in original) (internal citations and quotation marks omitted). "We interpret the terms of the agreement according to the parties' reasonable expectations and construe any ambiguities against the drafter—the government—and in favor of the defendant." *United States v. Woods*, 581 F.3d 531, 534 (7th Cir. 2009). "The government must fulfill any promise that it expressly or impliedly makes in exchange for a defendant's guilty plea." *United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir. 1992). The remedy for breach of a plea agreement is specific performance and a remand for resentencing before a different judge, or a remand to permit the defendant to withdraw his plea. *United States v. Diaz-Jimenez*, 622 F.3d 692, 694 (7th Cir. 2010). Mr. O'Doherty seeks resentencing.

Mr. O'Doherty emphasizes that the plea agreement's recitation of the facts is limited to only the charged period of 2001-2003. He notes that the agreement's section on relevant conduct states that "based on the facts now known to the government," the "anticipated offense

level is 19." R.18 at 8. In his view, because the Government was aware of his full course of conduct at the time it entered into the agreement, its decision not to incorporate the earlier period into the written contract is tantamount to a promise not to raise it at sentencing. He acknowledges that the section continued with language that the calculations are "preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely" and that the Government may "conclude that different or additional Guideline provisions apply." *Id.* In his view, however, these "boilerplate" provisions cannot vitiate the more specific language of the agreement. Appellant's Br. 24.

Our principal difficulty with Mr. O'Doherty's argument is that it misconstrues the language of the pertinent section of the agreement, and "a party's rights under a plea agreement are limited by what the parties in fact agreed to," *United States v. Schilling*, 142 F.3d 388, 395 (7th Cir. 1998). As we already have noted, the section concerning relevant conduct provides that "[t]he defendant acknowledges that the government can prove" that the tax loss from the charged period is $425,766. R.18 at 6. It says nothing about any promise by the Government to limit its relevant conduct recommendation to those amounts with respect to the charged years, nor does it say anything whatsoever about any obligations with respect to the uncharged years. Moreover, the subsequent language—that the calculations are non-binding predictions, not entitled to reliance by any party—further clarifies the parties' understanding on this issue.

*United States v. Schilling*, 142 F.3d 388 (7th Cir. 1998), is instructive. There, the defendant entered into a plea agreement in which he acknowledged the purchase and sale of 300,000 gallons of fuel for which he failed to pay excise taxes. The Government made no reciprocal promise to limit its recommendation and retained "'the right to fully apprise the Court of the nature of the criminal conduct.'" *Id.* at 393 (quoting the plea agreement). When the Government stepped forward at sentencing with evidence showing a much more significant figure for the fraud, the defendant claimed a breach. The district court found none, and we affirmed. Among the factors guiding our interpretation, we noted both the Government's reserved right and the one-sided nature of the acknowledgment of criminal conduct. *See id.* at 396-98. Those factors are mirrored in the agreement now before us.

Furthermore, beyond the literal language of the plea, Mr. O'Doherty's own conduct surrounding the plea supports the view that both parties understood and intended that the losses stated in the agreement remained uncertain. During the plea colloquy, for example, Mr. O'Doherty's attorney indicated to the court that there was a "fairly good chance" that the tax losses would be less than the figure—in excess of $400,000—admitted in the plea agreement and that the expected reduction "would then affect the guideline sentence." R.44 at 12. When the court expressed some confusion about whether the parties had agreed to a tax loss number, the Government attorney noted, "[B]oth parties acknowledge there may be further calculations, and the plea

agreement allows for that, that if there are additional calculations that the tax amount may change." *Id.* The court then clarified, "So, if he argues that it is less than $400,000, that would not void the agreement is what you are telling me?" *Id.* The Government responded in the affirmative. *Id.* at 13. Mr. O'Doherty's attorney did not dispute this interpretation. In fact, Mr. O'Doherty did argue for a tax loss figure of less than $400,000—and continues to do so before this court. We see no principled basis for concluding that the agreement bound the Government to the initial tax loss figure but permitted Mr. O'Doherty to challenge it.

Mr. O'Doherty makes the related argument that, even if the Government were entitled to argue different figures for the years charged, it was not permitted to include new years altogether. Again, we see nothing in the language or structure of the agreement that supports this interpretation.

## B.  Proof of Tax Loss

Mr. O'Doherty next argues that the Government failed to meet its burden of proof with respect to the tax loss amounts upon which his sentence was based. He contends that the Government "submitted no proof to substantiate the claimed tax loss for" the additional years. Reply Br. 4. Further, he explains that there is a "legal difficulty with using 1099[]s to determine tax loss." *Id.*

The Government must prove tax loss figures at sentencing by a preponderance of the evidence. *United States*

*v. Schroeder*, 536 F.3d 746, 752 (7th Cir. 2008). However, the Guidelines themselves acknowledge that identifying a perfect figure often will be impossible: "In some instances, such as when indirect methods of proof are used, the amount of the tax loss may be uncertain; the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts." U.S.S.G. § 2T1.1, app. 1.

Furthermore, we long have held that

> [a] district court may rely on the PSR in ruling on factual issues in the sentencing context as long as the PSR is based upon sufficiently reliable information. When the court relies on information contained in the PSR at sentencing, it is the defendant's burden to show that the PSR is inaccurate or unreliable. When a defendant has failed to produce any evidence calling the report's accuracy into question, a district court may rely entirely on the PSR.

*United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007) (internal quotation marks and citations omitted) (affirming a sentence as based upon sufficient evidence, even though the statements establishing the drug quantity amounts in the PSR were hearsay); *see also United States v. Coonce*, 961 F.2d 1268, 1280 (7th Cir. 1992) (setting forth the shifting burdens).[4]

---

[4] Mr. O'Doherty's reliance on *United States v. Tucker*, 217 F.3d 960, 961 (8th Cir. 2000), which states that "the PSR is not

(continued...)

Here, the PSR identified a pending civil case by its case number and correctly recounted the amount of tax sought by the Government for the earlier years. The PSR noted that the probation officer had conducted a telephonic interview with IRS Agent Marta Grijalva, who stated that the outstanding taxes sought in the civil case were calculated on the basis of available tax documents, including 1099s.

The information contained in the PSR is sufficiently reliable to support the Government's position at sentencing. The PSR sets forth the means by which it obtained the information, and, in turn, the means by which the IRS itself obtained the information. Mr. O'Doherty did not come forward with any evidence to suggest that the PSR's figures were incorrect. Indeed, he has maintained that he has no better evidence. Nevertheless, he believes that the Government is required to prove, using some means better than the 1099s relied

---

[4] (...continued)

evidence, and the government has the burden at sentencing to prove fact-intensive issues such as tax loss by a preponderance of the evidence," is not persuasive. Our settled approach permits reliance on the PSR until evidence put forward by the defendant creates a question as to its reliability or accuracy. "A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce some evidence that calls the reliability or correctness of the alleged facts into question." *United States v. Mustread*, 42 F.3d 1097, 1101-02 (7th Cir. 1994) (internal quotation marks omitted).

upon by the IRS, his actual taxable income for these years. We already have rejected this view. *See United States v. Chavin*, 316 F.3d 666, 678 (7th Cir. 2002) (noting that a defendant is not entitled to create a "perfect" return to calculate tax loss in criminal proceedings); *see also id.* at 676-79 (rejecting the defendant's argument that tax loss should take into account legitimate, unclaimed deductions, which in that case would have reduced the defendant's tax liability to roughly twenty-five percent of that determined to be the tax loss at sentencing).

Mr. O'Doherty failed to meet his burden to draw the facts of the PSR sufficiently into question. The district court therefore was entitled to rely on the PSR in making its calculations. In any event, the sentencing transcript makes clear that the district court did consider the fact that the tax losses in the PSR potentially had been overstated and factored that consideration, along with family health and related matters, into the ultimate sentence under 18 U.S.C. § 3553(a). *See* R.18 at 30-31.

## C. Sophisticated Means

Finally, Mr. O'Doherty challenges the application of the two-level enhancement for use of a "sophisticated means" under the tax evasion guideline, U.S.S.G. § 2T1.1(b)(2). We review the district court's finding that the defendant used sophisticated means for clear error. *United States v. Becker*, 965 F.2d 383, 390 (7th Cir. 1992). Application Note 4 to this guideline provides,

> For purposes of subsection (b)(2), "sophisticated means" means especially complex or especially

intricate offense conduct pertaining to the execu-
tion or concealment of an offense. Conduct such as
hiding assets or transactions, or both, through
the use of fictitious entities, corporate shells, or
offshore financial accounts ordinarily indicates
sophisticated means.

U.S.S.G. § 2T1.1, app. 4. Mr. O'Doherty contends that his
use of a corporate structure was not "especially complex
or especially intricate." *Id.* Further, he maintains that the
corporations served legitimate purposes and were not
constructed exclusively to hide tax liability.

Our cases interpreting this enhancement have held that
it "does not require a brilliant scheme, just one that dis-
plays a greater level of planning or concealment than the
usual tax evasion case." *United States v. Fife*, 471 F.3d
750, 754 (7th Cir. 2006) (concluding that the use of
four corporations without physical offices or accounting
journals to shield income justified the enhancement). We
also have acknowledged that conduct less sophisticated
than the exemplary list provided in the application note
may still warrant application of the enhancement. *See
United States v. Kontny*, 238 F.3d 815, 820-21 (7th Cir. 2001)
(holding that the enhancement was warranted where
the defendants avoided employment taxes by writing
separate checks to conceal overtime wages to employees
and accounting for those additional amounts as non-wage
expenses); *Becker*, 965 F.2d at 390 (depositing receipts
in son's bank account and in a "warehouse bank" with
accounts designated only by number justified enhance-
ment). Indeed, "the essence of the definition is merely

deliberate steps taken to make the offense . . . difficult to detect." *Kontny*, 238 F.3d at 821 (modification in original) (internal quotation marks omitted).

Mr. O'Doherty failed to file tax returns over a significant period of time. Still, during the charged period, he used corporations to avoid the direct reporting of income in his name, and he used the funds in those corporations as personal funds. *See* R.18 at 4 (plea agreement's recitation of facts). Although he protests that corporations are ubiquitous "in most modern business transactions," Appellant's Br. 36, their use to impede the discovery of personal income, as they were used here, permits the imposition of the enhancement.

### Conclusion

The Government did not breach the plea agreement when it concurred with the recommendations of the PSR regarding relevant conduct. Further, the scope of that conduct was explained in the PSR, and Mr. O'Doherty failed to present evidence that sufficiently challenged its reliability or accuracy. Accordingly, the district court was entitled to rely on the PSR in making its factual determinations. Finally, Mr. O'Doherty's chosen method to perpetrate his fraud was sufficiently sophisticated to justify application of the sophisticated means enhancement. The judgment of the district court is affirmed.

AFFIRMED