UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.                                              No. 02-4319

OLLIE BRYAN STONE,
           *Defendant-Appellant.*

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.                                              No. 02-4461

JAMES L. YATES,
           *Defendant-Appellant.*

UNITED STATES OF AMERICA,
           *Plaintiff-Appellant,*

v.                                              No. 02-4541

JAMES L. YATES,
           *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-00-530)

Argued: September 25, 2003

Decided: January 22, 2004

Before WILKINSON, TRAXLER, and GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Robert Charles Bonsib, MARCUS & BONSIB, Greenbelt, Maryland; Allen Howard Orenberg, DILWORTH PAXSON, L.L.P., Washington, D.C., for Appellants. David Ira Salem, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Ronald J. Tenpas, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Appellants Ollie Bryan Stone and James L. Yates were both convicted of conspiracy to defraud the United States government in violation of 18 U.S.C.A. § 371 (West 2003) and of filing false claims upon the United States government in violation of 18 U.S.C.A. § 287 (West 2003). Stone also pleaded guilty to filing false income tax returns between the years of 1994 and 1997 in violation of 26 U.S.C.A. § 7206 (West 2003). The district court sentenced Stone to eighty-four months imprisonment, and sentenced Yates to sixty days imprisonment to be served by intermittent confinement for thirty weekends. Stone and Yates appeal, raising various challenges to their convictions and sentences. The government cross-appeals Yates's sentence. We affirm the convictions of Stone and Yates, as well as Stone's sentence, but we vacate Yates's sentence and remand for resentencing.

I.

In 1988, Ollie Bryan Stone began employment as an electrician with the General Services Administration ("GSA") at the Suitland federal complex in Suitland, Maryland ("Suitland"). By 1995, Stone was recognized by most of the building managers at Suitland as "sort of the lead electrician." J.A. 290. While at Suitland, Stone also served as a team leader for employees in charge of electrical repairs. As a team leader, Stone determined whether electrical repairs could be handled by Suitland electricians or needed to be outsourced to a private contractor. Those outsourced projects costing more than $2,000 were assigned to a private contractor after a bidding process. For those outsourced projects costing less than $2,000 — "micropurchases" — bidding was not required and an expedited approval process was used. Under this expedited process, the GSA employee requesting the repair work (the "buyer"), in this case Stone, completed an internal GSA form known as a Form 2010. This form documented the work being requested, the outside contractor's name and address, and the cost of the services being rendered.

The buyer would submit both the completed Form 2010 and the contractor's invoice to a building manager or some other employee authorized to approve the request. In most instances, prior approval by a building manager was required before work could commence; however, if an emergency repair was required, buyers were authorized to have the work done and then to seek approval after the fact.

Because Stone served as a team leader for Suitland's electricians and was recognized as a "lead electrician," Stone usually prepared the Forms 2010 for electrical repairs. Many of the building managers charged with reviewing and approving Stone's requests had no electrical training. Consequently, they relied upon the representations made by Stone in the Form 2010s.

At some point, Stone began approaching Christian Fitzgerald, Michael Lewis, and James Clark, contractors who were doing legitimate work at Suitland, and asking these contractors to either inflate their invoices for work done at Suitland or submit false invoices for work never done at GSA.[1] They agreed and the scheme evolved.

---

[1] All three contractors pleaded guilty to conspiracy to defraud the federal government.

Stone would generally categorize the invoices as being for emergency work, allowing him to request payment without having prior approval. Upon receiving payment from GSA, Fitzgerald, Lewis, and Clark would provide Stone with his share of the overcharges through gifts and cash payments. Among the gifts Stone received were an all-terrain vehicle, furniture, guitars, a hot tub, and bloodhounds. The contractors also performed free work on Stone's home.

Stone also enlisted the assistance of his accountant, Jim Yates, to recruit additional participants in the conspiracy and to prepare false paperwork to conceal the scheme. As a result, Yates approached Nicholas, Giuseppe, and Frank Gallo (the "Gallos") about forming new contracting companies or using their existing companies to submit false invoices to Suitland.[2] Yates was a family friend of the Gallos and performed accounting work for them. In an effort to convince the Gallos to participate in Stone's scheme, Yates explained that he would prepare the paperwork for the formation of the companies. Yates further explained to the Gallos that the work would be completed by subcontractors hired by Stone, thus minimizing the risk to the Gallos. Moreover, Yates explained that he would prepare the invoices and forward the payments received by the Gallos to Stone. Stone would then use the money to pay the subcontractors. In return for their cooperation, the Gallos were promised ten percent of the payment received from GSA.[3]

In 2000, GSA and the Internal Revenue Service ("IRS") began a joint investigation into the activities of Stone and his co-conspirators. As a result of this investigation, several search warrants were issued.

---

[2]In 1996, Yates also approached Antonio DeLeonibus about establishing a general contracting company. Yates did so despite having knowledge that DeLeonibus was not qualified to do general contracting work. To entice DeLeonibus to join the scheme, Yates described the proceeds of the scheme as "free money." Despite Yates's efforts, however, DeLeonibus declined to participate in the conspiracy.

[3]At trial, the Gallos testified that they never received the ten percent they were promised. The Gallos did not have personal knowledge about whether the work was performed by other contractors or what was done with the money they gave to Yates. At about the same time, the Gallos also performed contracting work on Stone's and Yates's homes.

Upon learning of the search warrants, Stone sought to cover up the scheme. He called Lewis and instructed him to contact the Gallos and Yates. In response, Lewis set up two meetings with Yates. During the first meeting, Yates, who was carrying a firearm, instructed Lewis to undress to ensure that he was not wired. After determining that Lewis was not wired, Yates reviewed with Lewis the items Lewis had purchased for Stone as kickbacks. Yates later returned to Lewis two guitars Lewis had purchased for Stone.

As part of his effort to conceal the scheme, Yates also contacted Fitzgerald and offered to prepare false paperwork that would create the impression that Stone worked for Fitzgerald. It was hoped that this false paperwork would help explain any gifts provided to Stone by Fitzgerald. Yates even visited Fitzgerald's home and inspected his records to determine the best way to create the appearance that Stone was employed by Fitzgerald. Despite Yates's repeated attempts to convince Fitzgerald to help conceal the scheme, Fitzgerald declined to assist Yates and Stone and did not have any contact with them after Yates's visit to his home.

Notwithstanding the efforts of Stone and Yates to conceal the scheme, GSA and the IRS gathered sufficient evidence to obtain a grand jury indictment. On October 25, 2000, the grand jury returned a twelve-count indictment charging Stone, Yates, and others.[4] The indictment was subsequently superseded by a fourteen-count indictment filed on October 18, 2001. Count One charged Stone and Yates with conspiracy to defraud the United States government. Counts Two through Ten charged Stone with filing false claims upon the United States government. Counts Six through Eight also charged Yates with filing false claims. Counts Eleven through Fourteen — which were severed from the other counts prior to trial — charged Stone with filing false income tax returns, charges to which Stone later pleaded guilty.

The district court sentenced Stone to a term of eighty-four months imprisonment. In sentencing Stone, the district court departed upward

---

[4]Fitzgerald later pleaded guilty to a separate criminal information filed by the government and agreed to cooperate with the government in its case against Stone and Yates.

pursuant to Section 2T1.1(b)(2) (use of a sophisticated means) and Section 3B1.3 (abuse of a position of trust or use of a special skill) of the Sentencing Guidelines. *See* United States Sentencing Commission, *Guidelines Manual*, §§ 2T1.1 & 3B1.3 (Nov. 1997) ("U.S.S.G.") The district court, however, continued Yates's sentencing hearing in order to determine whether Yates's family circumstances warranted a downward departure. The district court later determined that a nine-level downward departure was warranted under Sections 5H1.6 and 5K2.0 of the Sentencing Guidelines. The district court also imposed a three-level upward adjustment pursuant to Section 3B1.1 (manager or supervisory role in the offense) of the Sentencing Guidelines. As a result, the district court sentenced Yates to sixty days imprisonment to be served over thirty weekends.

## II.

The defendants first argue that the district court erred by denying their motions for severance. We review a district court's denial of a motion to sever for an abuse of discretion. *See United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996). Both Stone and Yates argue that severance was required because they presented antagonistic defenses. Yates also argues that the district court erred in denying his motion for severance because of the prejudicial spillover evidence relating solely to Stone. We will address each of these contentions in turn.

## A.

Claiming mutually antagonistic defenses, Stone and Yates initially assert error in the district court's denial of their motions for separate trials under Rule 14 of the Federal Rules of Criminal Procedure. We find no merit in this argument.

Defendants who are alleged to have participated in the same transaction or series of transactions may be charged in a single indictment. *See* Fed. R. Crim. P. 8(b). "The basic rule is that persons who have been indicted together, particularly for conspiracy, should be tried together." *United States v. Tipton*, 90 F.3d 861, 883 (4th Cir. 1996). Rule 14 of the Federal Rules of Criminal Procedure provides that the court may grant a severance if it appears that a defendant or the government is prejudiced by a joinder of the defendants for trial. *See* Fed.

R. Crim. P. 14. "Antagonistic defenses do not *per se* require sever-
ance, even if the defendants are hostile or attempt to cast blame on
each other." *United States v. Becker*, 585 F.2d 703, 707 (4th Cir.
1978); *see also Zafiro v. United States*, 506 U.S. 534, 538 (1993). In
order to obtain a severance on the ground of conflicting defenses, the
parties must demonstrate that "the conflict is so prejudicial that the
differences are irreconcilable, 'and that the jury will unjustifiably
infer that this conflict alone demonstrates that both are guilty.'"
*Becker*, 585 F.2d at 707 (internal quotation marks omitted).

The defendants' argument hinges on the fact that there were dis-
crepancies in the trial testimony given by Stone and Yates regarding
the Gallos' involvement in the conspiracy. At trial, Yates testified that
he turned over to Stone the cash given to him by the Gallos and, like
the Gallos, assumed that Stone had subcontractors perform the work
at Suitland. Stone, in his defense, denied any involvement with the
Gallos and disclaimed the receipt of any money either directly from
the Gallos or indirectly through Yates. As a consequence of this con-
flicting testimony, Stone and Yates argue, they were unfairly preju-
diced because the jury unjustifiably would have inferred that this
conflict alone demonstrated that both Stone and Yates were guilty.

"A defendant must show prejudice in order for the court's ruling
to constitute an abuse of discretion." *United States v. Porter*, 821 F.2d
968, 972 (4th Cir. 1987). "No prejudice exists if the jury" can "make
individual guilt determinations by following the court's cautionary
instructions" and "appraising the independent evidence against each
defendant." *Id.* Neither Stone nor Yates has made the requisite show-
ing of abuse of discretion by the district court. Each defendant was
able to put forth his own individual theory of the case. When neces-
sary, the district judge issued instructions to limit any potential preju-
dice inherent in a witness's testimony. These cautionary instructions
allowed the jury to make individual guilt determinations. In light of
the overwhelming evidence against both Stone and Yates, the jury
was well within its province to convict each appellant. Indeed, the
jury was not required to rely on either defendant's testimony in order
to conclude that they were both guilty, and we see nothing about the
allegedly conflicting testimony that is unfairly prejudicial to Stone or
Yates. Independent testimony and documentation supplied ample evi-
dence to connect both Stone and Yates to the conspiracy. Because the

defendants have failed to demonstrate that the antagonistic defenses alone resulted in conviction, we conclude that the district court did not abuse its discretion in denying their severance motions.

## B.

Yates further contends that the district court erred in denying his motion for severance because of the danger of prejudicial spillover of evidence relating solely to Stone. This argument also fails.

As we have already noted, defendants charged in the same conspiracy indictment should ordinarily be tried together. *United States v. Roberts*, 881 F.2d 95, 102 (4th Cir. 1989). "The fact that the evidence against one defendant is stronger than the evidence against other defendants does not in itself justify severance." *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir. 1992); *see also United States v. Hargrove*, 647 F.2d 411, 415 (4th Cir. 1981). "If this were the case, motions to sever, which are rarely granted in conspiracy cases, . . . would have to be granted almost as a matter of course." *Brooks*, 957 F.2d at 1145 (citation omitted). Rather, the party moving for severance must establish that prejudice would result from a joint trial, not merely that separate trials would result in a better chance of acquittal. *See United States v. Parodi*, 703 F.2d 768, 780 (4th Cir. 1983). The defendant must show that he or she was deprived of a fair trial or suffered undue prejudice. *See*, *e.g.*, *United States v. Samuels*, 970 F.2d 1312, 1314 (4th Cir. 1992); *United States v. Brugman*, 655 F.2d 540, 543 (4th Cir. 1981).

Our review of the record convinces us that Yates cannot meet this heavy burden. Not only would much of the evidence admitted against Stone have been admissible at a separate trial to show the nature of the conspiracy with which Yates was charged, but the evidence adduced against Yates was also more than ample to sustain his convictions. Under these circumstances, it cannot be said that the district court abused its discretion in denying the motion for severance.

## III.

Yates further maintains that the government proved not one conspiracy, but multiple conspiracies. To support this contention, Yates

notes that (1) he had nothing to do with Clark; (2) neither Clark nor Yates knew of the other's involvement; and (3) Yates's involvement with Fitzgerald and Lewis only occurred after the 1999 search warrant was executed. Because Yates allegedly had nothing to do with the conspiracy involving Stone, Fitzgerald, Lewis, and Clark, Yates argues, he should have only been tried as part of the Stone and Gallos conspiracy.

In our view, the evidence is more than sufficient to support a finding of a single conspiracy. That Yates never knew of Clark's involvement and only became involved in later criminal activities is irrelevant. *See United States v. Johnson*, 54 F.3d 1150, 1154 (4th Cir. 1995) (concluding that evidence established a single conspiracy even if the members of the conspiracy did not know each other or had limited contact with each other); *United States v. Banks*, 10 F.3d, 1044, 1054 (4th Cir. 1993) ("[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence.").

IV.

We turn now to Stone's contention that the district court's denial of his motion to reopen his case following the testimony of Yates, his co-defendant, denied Stone his constitutional right to present defense witnesses. At trial, Stone put on his case-in-chief first, followed by Yates. The parties did not object to proceeding in this order. Near the end of the trial, and after Stone had presented his case, Yates testified. His testimony, as the district court described it, "just absolutely slamm[ed] Mr. Stone." J.A. 1403. While the district court was initially concerned about the fact that Yates, as the last defendant to put on a case, "literally [became] a government witness against another defendant [Stone]," upon further reflection the court noted that it did not find the conflict to be as profound as it did on first impression. *See* J.A. 1402, 1420.

It is within the district court's sole discretion to reopen a case to admit new evidence. *United States v. Abbas*, 74 F.3d 506, 510 (4th Cir. 1996). When reviewing whether or not the district judge abused his discretion in not reopening the case,

> we examine (1) whether the party moving to reopen pro-
> vided a reasonable explanation for failing to present the evi-
> dence in its case-in-chief; (2) whether the evidence was
> relevant, admissible, or helpful to the jury; and (3) whether
> reopening the case would have infused the evidence with
> distorted importance, prejudiced the opposing party's case,
> or precluded the opposing party from meeting the evidence.

*Id.* at 511. In order to prevail under this test, Stone must satisfy each prong. If Stone is unable to substantiate even one prong, "due deference is given to the discretion of the sitting judge." *Id.*

After analyzing the first prong, we conclude that Stone did not provide the district court with a reasonable explanation of why he was unable to present the evidence during his case-in-chief. Yates testified as to Stone's relationship with the Gallos and stated that he prepared invoices for the Gallos based upon Forms 2010 that were provided by Stone. He also stated that Stone organized the subcontractors who were supposed to perform the work for the Gallos at Suitland. Yates further testified that once GSA paid the Gallos for the work allegedly done at Suitland, one of the Gallos would cash the check and hand the money back over to Yates who would then give the entire sum to Stone. While Stone contends that Yates's hostile testimony came as a surprise, the record indicates that Stone had reason to expect that Yates's testimony could contradict him. The record indicates that, prior to trial, the government provided Stone's counsel with a transcript of the Gallos' grand jury testimony, in which they described their activities in a manner consistent with Yates's trial testimony.

Stone is also unable to satisfy the second prong of the test. If allowed to reopen his case, Stone himself was to be placed back on the witness stand. Because Stone's general defense throughout the trial was to deny all allegations put forth, his testimony could not have provided much new information.[5] Thus, because Stone is unable

---

[5]At trial, Stone denied any involvement with the conspiracy to defraud the government. He specifically denied any involvement in the arrangements made for the Gallos' companies to do work at Suitland. He denied speaking with Yates about the Gallos and their alleged work for GSA. He also denied telling Yates that the Gallos would get ten percent back from any GSA project to which they lent their name. Stone further denied receiving any money from Yates and specifically denied receiving any money for jobs the Gallos supposedly completed at Suitland.

to meet all the necessary criteria, we find that the district court did not abuse its discretion in denying his motion to reopen his case-in-chief.

V.

Stone and Yates maintain that the district court erred when it denied their joint motion to continue the trial to allow defense counsel time to examine certain medical records or, in the alternative, to exclude the testimony of Fitzgerald. Fitzgerald was one of three GSA contractors who pleaded guilty to charges related to the conspiracy to defraud GSA. In August 2001, during the course of his plea colloquy with the district court, Fitzgerald disclosed that he was under treatment by a mental health counselor. Shortly before trial in the instant case, the government received the pre-sentence report for Fitzgerald, which further described his treatment and indicated he was suffering from Bipolar II disorder. Approximately one week before the trial, the government disclosed this information, along with information pertaining to two prior alcohol-related arrests, to the defense. At roughly the same time, Fitzgerald's attorney asked the district court to seal the transcript of the guilty plea and provided the district court with a copy of his client's medical records. Neither the government nor the defendants had copies of those records.

Upon learning of the information pertaining to Fitzgerald, the defendants filed a motion for continuance to allow for a complete review of Fitzgerald's medical records by counsel and a defense expert. In the alternative, the defendants sought exclusion of Fitzgerald's testimony, claiming among other things that their lack of access to his records interfered with their Sixth Amendment rights to confront and cross-examine the government's witness. The district court denied the motion for a continuance. After conducting an *in camera* review of Fitzgerald's mental health records, the district court also denied the motion to exclude Fitzgerald's testimony. The district court did, however, permit the defendants to cross-examine Fitzgerald as to the existence of his psychiatric treatment and alcohol abuse issues, but the court prevented defendants from probing in great detail into such treatment.

The defendants contend that the denial of access to Fitzgerald's mental health records violated their Sixth Amendment right to con-

frontation and irreparably prejudiced them. They argue that because
the government's case rested on Fitzgerald's testimony and their
defense centered on attacking his credibility, they were entitled to
Fitzgerald's mental health records for use in cross-examination. We
may reverse the district court's denial of the defendants' motion only
for an abuse of discretion. *United States v. McMillion*, 14 F.3d 948,
955-56 (4th Cir. 1994).

The opportunity for cross-examination is central to the constitu-
tional right of confrontation. *See Davis v. Alaska*, 415 U.S. 308, 315-
16 (1974). This constitutional standard is met when defense counsel
is enabled to bring before the jury facts bearing on a witness's reli-
ability. *Id.* at 318. In this case, the defendants were able to bring to
the jury's attention the facts affecting Fitzgerald's credibility without
accessing his mental health records. There was no need to disclose
Fitzgerald's mental health records to defense counsel. The district
court permitted the defendants to rigorously cross-examine Fitzgerald,
allowing them to bring before the jury facts bearing on Fitzgerald's
reliability. Counsel for Stone questioned Fitzgerald at length about his
psychiatric treatment. Fitzgerald acknowledged that he suffered from
Bipolar II disorder, that he was currently under treatment, that he had
seen as many as five different doctors over time, that he was on spe-
cific medication, that he occasionally self-medicated, that he was con-
fused at times, that he had disorganized thinking, and that he had
trouble sleeping and experienced depression. Counsel for Stone also
questioned Fitzgerald about his arrests for drunk driving. Counsel for
Yates touched on the same subjects, and questioned Fitzgerald about
his marital problems. Thus, the facts of Fitzgerald's mental state and
treatment were disclosed in great detail to the jury. Denial of access
to the records, therefore, did not deprive Stone and Yates of their right
to confrontation.

In addition, even if we were to conclude that it was an error to deny
the defendants access to Fitzgerald's mental health records, such error
would be harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684
(1986) (holding that the denial of a defendant's opportunity to cross-
examine a witness is subject to harmless-error analysis). Fitzgerald
was one of three government cooperators providing testimony regard-
ing the defendants' involvement in a scheme to defraud GSA. Thus,
given the extent of the government's evidence and the defendant's

ability to cross-examine Fitzgerald, we find that any error was harmless.

## VI.

We turn next to the defendants' contention that the district court erred in its jury instructions. The decision whether to give a jury instruction and the content of an instruction are reviewed for abuse of discretion. *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992). Yates contends the district court erred by giving a "willful blindness" instruction. Stone and Yates also argue that the district court should have given an instruction defining reasonable doubt. Again, we disagree.

## A.

Yates first contends that the district court erred in giving a willful blindness instruction with respect to Counts Six and Seven, which charged Yates with submitting and causing the submission of false claims to GSA. A willful blindness instruction allows a "jury to impute the element of knowledge to [a] defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991). Yates contends that the willful blindness instruction was erroneously given because there was insufficient evidence presented of deliberate ignorance, but instead, only evidence of actual knowledge on his part. As this court has previously stated, however, "[a] willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." *Abbas*, 74 F.3d at 513 (internal quotation marks omitted). "The record need not contain direct evidence, however, that the defendant deliberately avoided knowledge of wrongdoing; all that is necessary is evidence from which the jury could infer deliberate avoidance of knowledge." *United States v. Whittington*, 26 F.3d 456, 463 (4th Cir. 1994).

Yates asserted a lack of knowledge that the Gallo invoices he prepared were false. At trial, the government introduced evidence of a wide variety of unusual activities engaged in by Yates relating to the preparation and submission of the invoices. For example, Yates pre-

pared invoices at Stone's request, but Yates never contacted any of the subcontractors who had ostensibly performed the work, nor did he request copies of any receipts from the subcontractors. This evidence easily supports the inference that if Yates was unaware of what was going on, it was only because he deliberately shut his eyes to it.[6] Accordingly, we find that the district court did not err in giving the jury a willful blindness instruction.

## B.

Finally, defendants argue that the district court erred by refusing to define reasonable doubt. "The law is well-settled in this Circuit that a judge is not allowed to define reasonable doubt unless requested to do so by the jury." *United States v. Patterson*, 150 F.3d 382, 389 (4th Cir. 1998). Therefore, we find that the district judge did not abuse his discretion in refusing to define reasonable doubt.

## VII.

Both Stone and Yates also challenge their sentences. Stone contests the two-level sentencing enhancement for abuse of a position of trust and use of a special skill under Section 3B1.3 of the Sentencing Guidelines. Stone also contests the two-level sentencing enhancement for the use of sophisticated means to commit an offense under Section 2T1.1(b)(2) of the Sentencing Guidelines. Yates contests the three-level sentencing enhancement for his role in the offense under Section 3B1.1(b) of the Sentencing Guidelines. We address each contention in turn.

---

[6]As described at trial, Yates worked as a CPA and was employed, for a time, in the Inspector General's Office of the Department of Health and Human Services ("DHHS"), which investigated criminal activity involving DHHS, including fraud. Thus, Yates was familiar with government fraud. Yates's professed ignorance in the face of these condemning circumstances suggests a deliberate avoidance of knowledge of the use of false and inflated invoices.

A.

Stone argues that the district court erred in assessing a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust and the use of a special skill to facilitate or conceal the commission of a crime.[7] We review for clear error the district court's factual findings that support the enhancement. *United States v. Mackey*, 114 F.3d 470, 475 (4th Cir. 1997) (concluding that whether defendant abused a position of trust was a factual determination); *United States v. Helton* 953 F.2d 867, 869 (4th Cir. 1992) (concluding that whether defendant abused a position of trust or used a special skill is a factual question). To the extent the district court undertakes a legal interpretation of any guideline, our review is de novo. *United States v. Gormley*, 201 F.3d 290, 294 (4th Cir. 2000).

(1)

We turn first to Stone's challenge to the district court's decision to enhance his sentence based on an abuse of trust. "The basic question" is whether Stone, by submitting false or inflated Forms 2010, "abused a position of trust with respect to the victims of his fraud scheme within the meaning of Guidelines § 3B1.3." *United States v. Caplinger*, 339 F.3d 226, 236 (4th Cir. 2003). "Determining what constitutes a position of trust for the purposes of § 3B1.3 is not a simple task." *United States v. Morris*, 286 F.3d 1291, 1296 (11th Cir. 2002)(internal quotation marks omitted).

Under Section 3B1.3 of the Sentencing Guidelines, a district court must increase a defendant's sentence by two levels "[i]f the defendant abused a position of public or private trust" and that abuse "signifi-

---

[7]Under U.S.S.G. § 3B1.3, the court may assess a two-level enhancement if the defendant abused a position of trust or used a special skill to facilitate or conceal the commission of a crime. In applying the enhancement in this case, the district court concluded that Stone both abused a position of trust and used a special skill to facilitate or conceal the commission of the crime. While the district court relied on both grounds in deciding to assess the enhancement under Section 3B1.3, a district court need only find one of the grounds is satisfied in order for the enhancement to apply.

cantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3; *see also United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999). The commentary to the Sentencing Guidelines explains that

> "[p]ublic or private trust" refers to a position of public or private trust characterized by professional or managerial discretion. . . . For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense. . . . This adjustment for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.

U.S.S.G. § 3B1.3, comment. (n.1).

This court has identified several factors that courts should consider in determining whether a defendant held a position of trust.

> First, courts ask whether a defendant had special duties or special access to information not available to other employees. Second, the defendant's level of supervision or degree of managerial discretion is relevant. Bank tellers who embezzle from their employers provide an example of a situation where there is little trust to abuse because the employees are closely supervised, and it is expected that wrongs they commit will be readily detected. Third, the analysis also entails an examination of the acts committed to determine whether *this* defendant is more culpable than others who hold similar positions and may commit crimes.

*United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995) (internal quotation marks and citations omitted); *see also United States v. Glymph*, 96 F.3d 722, 727 (4th Cir. 1996).

We have emphasized that the "position of trust" inquiry must focus on the relationship between the defendant and the victim from the vic-

tim's perspective. *Gordon*, 61 F.3d at 269. "There must be a trust relationship between the defendant and his victim for the enhancement to apply." *United States v. Moore*, 29 F.3d 175, 180 (4th Cir. 1994) (internal quotation marks and alteration omitted). In this case, the primary victim of Stone's scheme was GSA, which was misled by Stone's fraudulent Forms 2010.

In reviewing the factors mentioned above, we cannot conclude that the district court clearly erred in determining that Stone held a position of trust and abused it. Viewed from GSA's perspective, Stone exercised enormous discretion: as a lead electrician, Stone's judgments with respect to necessary repairs ordinarily received great deference. Stone had knowledge about electrical repairs that the building managers who signed off on the Forms 2010 did not. This specialized knowledge allowed him to earn a "position of trust within the employment hierarchy and nobody looked over his shoulder." J.A. 1811. In short, Stone was entrusted with responsibilities beyond those of other electricians and repairmen at Suitland.

The evidence also clearly shows that Stone used his position in a manner that significantly facilitated the commission or concealment of the crime. He was the initiator of the fraud scheme, he instructed others on how to defraud GSA and on how to avoid detection, and significantly, he was in charge of the electrical repairs that were the basis of the fraud scheme. *See United States v. Johnson*, 4 F.3d 904, 917 (10th Cir. 1993). Stone's instructions to Fitzgerald, Lewis, Clark, and Yates about how to prepare invoices and submit inflated and false Forms 2010 were designed to aid in the commission and concealment of the fraud scheme. Stone's actions significantly facilitated the fraud and constituted an abuse of his position as "lead electrician." Accordingly, we conclude that the district court did not err in increasing Stone's guideline range by two levels for abusing a position of trust.

(2)

In applying the two-level enhancement under Section 3B1.3 of the Sentencing Guidelines, the district court also concluded that Stone used a special skill to facilitate or conceal the commission of a crime. Stone contends that the district court erred because his skills as an electrician did not rise to the level contemplated by the Guidelines.

Section 3B1.3 provides: "If the defendant . . . used a special skill in a manner that significantly facilitated the commission or concealment of the offense, increase [the offense level] by 2 levels." U.S.S.G. § 3B1.3. The analysis of whether Stone's status as an electrician constituted a special skill used to facilitate the crime involves two distinct questions: (1) whether being an electrician is a special skill within the meaning of Section 3B1.3 of the Guidelines; and (2) whether that skill was used to facilitate the crime. The commentary to the Guidelines explains that "'[s]pecial skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.3 comment. (n.2). The examples of special skills provided in the commentary seem to require more skilled education, training and licensing than is usually associated with being an electrician. *See id.* ("pilots, lawyers, doctors, accountants, chemists, and demolition experts"). Although we do not rule out the possibility that the skills of an electrician may be sufficient for application of Section 3B1.3 in some cases, the record in this case does not justify its application here.

In any event, "to qualify under the guidelines, the special skill must, at a minimum, be used to actually commit or conceal the crime, rather than merely to establish trust in a victim upon whom the defendant then perpetrates a garden variety fraud." *United States v. Hickman*, 991 F.2d 1110, 1113 (3rd Cir. 1993). Moreover, "the case law has generally required a *direct* use of the special skill." *Id.* Stone did not directly use his electrical skills to facilitate this crime. He simply took advantage of his position of trust and used it to defraud GSA. Thus, we conclude that the use of special skill as a basis for the upward adjustment under Section 3B1.3 constituted legal error.

As noted earlier, however, the district court need only find one of the grounds — abuse of a position of trust or use of a special skill — is satisfied in order for the enhancement under Section 3B1.3 to apply. Therefore, because we have already found that the upward adjustment pursuant to Section 3B1.3 was justified based on Stone's abuse of a position of trust, Stone's sentence need not be recalculated.

B.

Stone also contends that the district court erred by imposing a two-level enhancement for using sophisticated means to impede discovery

of his tax fraud offense. *See* U.S.S.G. § 2T1.1(b)(2). We review this claim for clear error. *See United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001).

"Sophisticated means" includes "conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case." U.S.S.G. § 2T1.1, comment. (n.4). Standard examples include hiding assets in offshore bank accounts and conducting business through corporate shells or fictitious entities. *Id.*

The district court applied the two-level enhancement after noting that "the offense characteristic sophisticated means is captured in . . . [this] instance where the income is income in kind and is itself the output of a fraudulent scheme." J.A. 1827. The district court further found that Stone, among other things, "used fictitious entities," and had "people buying dogs in Alabama and bringing them . . . [to] Maryland to make a gift to Mr. Stone" in order to impede discovery of his tax fraud. *Id.*

Stone argues that his tax evasion was not sophisticated because it was nothing more than a failure to report income derived from "side jobs" and income in the form of in-kind benefits received during the conspiracy. We disagree. While it is true that the commentary to the Sentencing Guidelines "illustrates with examples suggesting a higher level of financial sophistication, . . . the essence of the definition is merely deliberate steps taken to make the offense difficult to detect." *Kontny*, 238 F.3d at 821 (internal quotation marks and alteration omitted). As the Seventh Circuit noted in *Kontny*, "'sophistication' must refer not to the elegance, the 'class,' the 'style' of the defrauder — the degree to which he approximates Cary Grant — but to the presence of efforts at concealment that go beyond . . . the concealment inherent in tax fraud." *Id.*

In this case, Stone received income "disguised as a gift, . . . [as] construction on a personal home, [and as] provision of personal services." J.A. 1828. Even though Stone's actions did not involve the use of offshore bank accounts or corporate shells, his use of "fictional entities to perpetrate the fraud" that created the income, as well as the use of in-kind gifts and services to disguise the unreported income undeniably made it more difficult for the IRS to detect his evasion.

This case does not present the situation where an individual taxpayer merely "completed his individual 1040 tax form with false information to avoid paying some of his federal taxes." *United States v. Jagim*, 978 F.2d 1032, 1042 (8th Cir. 1992). Thus, the district court's finding of sophisticated means was not clearly erroneous.

C.

Yates maintains that the district court erred in imposing a three-level enhancement under Section 3B1.1(b) of the Sentencing Guidelines based upon his role in the offense. Section 3B1.1(b) of the Sentencing Guidelines permits an upward adjustment of three levels if the "defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants." U.S.S.G. § 3B.1.1(b). Role in the offense adjustments are reviewed for clear error. *United States v. Sheffer*, 896 F.2d 842, 846 (4th Cir. 1990). Yates contends that he did not perform the role of a manager or supervisor, and that there was not evidence of five or more participants involved in the activity.

We look first to whether the criminal activity involved five or more participants. "A 'participant' is a person who is criminally responsible for the commission of the offense"; however, that person "need not have been convicted." U.S.S.G. § 3B1.1, comment. (n.1). Both parties agree that Stone, Fitzgerald, and Lewis can be defined as participants. As a member of the conspiracy, Clark is also a participant.[8] Finally, Yates himself can be counted as a participant for purposes of sentencing enhancement, as there is no requirement that there be five participants in addition to their manager. Instead, the enhancement may be applied as long as there is criminal activity that involved five or more participants. *See United States v. Fells*, 920 F.2d 1179, 1182 (4th Cir. 1990); *see also United States v. Wilder*, 15 F.3d 1292, 1299 (5th Cir. 1994); *United States v. Colletti*, 984 F.2d 1339, 1346 (3rd Cir. 1992); *United States v. Montoya*, 979 F.2d 136, 138 (8th Cir. 1992). Thus, there are at least five participants in this criminal activity.

---

[8]The fact that Clark had no connection with Yates is irrelevant. Section 3B1.1 of the Sentencing Guidelines does not require the manager, in this case Yates, to have held a managerial role over all of the participants.

Turning to the question of Yates's role in the offense, the record supports the district court's finding that Yates was a manager or supervisor. Yates recruited the Gallos to set up companies through which false work orders were submitted to GSA. As the district court noted, "[Yates] managed [the Gallo branch of the conspiracy] by setting up the companies. He managed it by contacting GSA. He managed it by doing the paperwork." J.A. 1821. Yates also managed the cover-up of the scheme to defraud.

Contrary to Yates's assertion, his role in the offense was not the equivalent of a mere "billing clerk." J.A. 1637. Rather, the evidence clearly indicates that Yates "not only managed [the Gallo branch of the conspiracy], but he actually ran the whole thing," and, at the very least, coordinated the activities of others. J.A. 1821. This is sufficient to warrant the enhancement. Thus, the district court did not clearly err in finding that Yates's role in the offense justified a three-level enhancement under Section 3B1.1(b) of the Guidelines.

VIII.

Finally, the government has cross-appealed Yates's sentence, maintaining that the court erred by departing downward nine levels on the basis of Yates's family responsibilities. Yates responds that it was proper for the court to award him the downward departure because of the extraordinary nature of his family circumstances.

At the sentencing hearing, Yates moved for a downward departure on the basis of several factors, chief among which were his family responsibilities.[9] The court heard evidence that Yates's son, Adam, was severely disabled and required almost constant care; that Yates's wife, Adam's primary caretaker, was ill and unable to take time to care for herself because of Adam's needs; and that Yates's daughter, a high school student, needed parental support and guidance. The district court, after considering Yates's argument and the government's objection, granted the downward departure on the basis of Yates's

---

[9]Specifically, Yates requested a downward departure on the basis of his medical and mental situation, his employment history, his family responsibilities, and the totality of the circumstances.

family responsibilities pursuant Section 5H1.6 of the Guidelines.[10] In granting the departure, the district court deemed Yates's family responsibilities to be extraordinary.

> [B]oth Adam's and Mrs. Yates'[s] life will be so under-
> mined, and their support systems will be so at risk if Mr.
> Yates is away from them for an extended period of time,
> that I believe and I find that this is the extraordinary circum-
> stance in this rare disfavored guideline factor. . . . Yates'[s]
> incarceration for 24 months would destroy this family by
> destroying Mrs. Yates and casting Adam into an abyss out
> of which I am absolutely convinced he would never climb.
> . . . So, I find and conclude that a departure, though disfa-
> vored, is independently justified under [Section] 5H1.6.

J.A. 1895, 1897, 1901.

Under the Sentencing Guidelines, a district court usually must impose a sentence within the applicable guideline range. *See United States v. Barber*, 119 F.3d 276, 279 (4th Cir. 1997). A sentencing court may depart from the applicable guideline range only when it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C.A. § 3553(b) (West 2003); *see United States v. Wilson*, 114 F.3d 429, 432 (4th Cir. 1997).

When deciding whether a departure is appropriate, the sentencing court must first establish "whether the potential basis for departure was forbidden, encouraged, discouraged, or unmentioned by the Commission." *Wilson* 114 F.3d at 433. In this case, the district court

---

[10]The district court granted the downward departure under "both 5H1.6, and, to the extent it adds anything . . . 5K2.0." J.A. 1906. While the court threw "everything [into] the mix" when considering whether a downward departure was warranted, it based its decision primarily on Section 5H1.6 of the Guidelines and Yates's family circumstances. J.A. 1907 & 1893. Specifically, the court noted that it did not "believe a departure [was] appropriate on the basis of Mr. Yates'[s] special medical condition [alone]." J.A. 1893.

departed on the basis of Yates's family circumstances, namely his role as a caregiver for his physically and developmentally disabled child. The Guidelines provide, however, that "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. Thus, the basis for the downward departure employed by the district court in this case is a "discouraged" factor. Where a factor is discouraged, "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *United States v. Koon*, 518 U.S. 81, 96 (1996).

This court has previously determined that a departure based on family responsibilities is "permitted only upon a finding that the defendant's family ties or responsibilities are extraordinary." *Wilson*, 114 F.3d at 434. "Generally, a sentencing court may depart downward on this basis only if it finds that the defendant is essentially 'irreplaceable.'" *Elliott v. United States*, 332 F.3d 753, 769 (4th Cir. 2003) (quoting *United States v. McClatchey*, 316 F.3d 1122, 1133 (10th Cir. 2003) (reversing downward departure for defendant based on care for his son because nothing in record "suggest[ed] that another individual could not provide the necessary assistance in [defendant's] absence")); *see also United States v. Sweeting*, 213 F.3d 95, 104 (3rd Cir. 2000) (reversing downward departure based on defendant's responsibility for child with Tourette's Syndrome because nothing indicated that the defendant was "so irreplaceable that her otherwise ordinary family ties and . . . responsibilities are transformed into the 'extraordinary'").

Although we sympathize with Yates's situation, the record fails to demonstrate that the care he provides is "irreplaceable." To the contrary, the evidence reflects that it is Mrs. Yates, Adam's primary caregiver, rather than Mr. Yates, who is "irreplaceable." While Mr. Yates does indeed play an important role in holding the family together and providing Mrs. Yates a great deal of support, his primary function is that of breadwinner. While Yates's incarceration will undoubtedly make life difficult for this already strained family, the effect of his absence on the family's financial situation and support network is not

different from what any family might face if the primary wage earner were sentenced to continuous imprisonment.[11]

Indeed, this court has found improper Section 5H1.6 departures under circumstances equally as compelling as Yates's. *See Elliot*, 332 F.3d at 768-69 (4th Cir. 2003) (finding that district court abused its discretion in departing downward under § 5H1.6 where defendant was primary caregiver for an incapacitated husband who suffered from cancer, heart disease, diabetes, memory loss and confusion); *Wilson*, 114 F.3d at 434 (reversing downward departure based on § 5H1.6 where father who was 21 years old had remained with his newborn child rather than abandoning child); *United States v. Rybicki*, 96 F.3d 754, 759 (4th Cir. 1996) (holding that district court abused its discretion in departing downward under § 5H1.6 based on defendant's responsibilities for his wife and son, both of whom had medical problems); *United States v. Maddox*, 48 F.3d 791, 799 (4th Cir. 1995) (reversing downward departure for extraordinary family ties where the district court found that the defendant provided invaluable care for his severely mentally disabled sister and his mother and was "crucial to the structure and stability of his family"); *United States v. Bell*, 974 F.2d 537, 538-39 (4th Cir. 1992) (disapproving departure based on § 5H1.6 because defendant's responsibilities in a two-parent family were even less extraordinary than those of a defendant who was a single, custodial parent, despite finding of the district court "that an extended period of incarceration would lead to the destruction of the family"). Accordingly, while we appreciate the difficult circumstances with which the district court was faced, we hold that the finding that Yates's family situation constituted an extraordinarily family responsibility was an abuse of discretion.[12]

---

[11]The district court noted that the family would be able survive financially during the time of Yates's incarceration.

[12]To the extent that the district court based its departure under Section 5K2.0 on the accumulation of several factors, our rejection of the primary factor, Yates's family responsibility, necessarily results in a finding that the district court's departure under Section 5K2.0 was also an abuse of discretion.

## IX.

For the foregoing reasons, we affirm Stone's convictions and sentence. We also affirm Yates's convictions, but we vacate his sentence and remand for resentencing in accordance with this opinion.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*